Good afternoon. Our next case is number 21-1935, United States of America v. Richard Collins. Mr. Silversmith. Thank you, Your Honor. And before I forget, I'd like to reserve six minutes for rebuttal. Okay. I'm here on behalf of Mr. Collins, and I thank the Court for setting this formal argument. We present three distinct arguments in our brief, and I'd like to make sure that I get a chance to address all three. The first one is we think that the district court erred as a matter of law by finding under these facts that Mr. Collins acted willfully. The facts really are not in dispute. Mr. Collins voluntarily stepped forward. Is that a legal conclusion or a factual conclusion? Well, you know, I think that he voluntarily stepped forward or that he didn't act willfully. Whether or not somebody acts willfully? You know, our position is under this case it should be viewed as a legal conclusion because the facts are not in dispute. But I understand that it can be both factual and legal. How are you defining willful? Well, currently this circuit defines willful under the recklessness standard of Safeco, which is, I think, sort of a harsh result because Safeco was issued some 20 years after the Bank Secrecy Act, which uses the term willful interchangeably between civil and criminal. But under the law of this circuit, at least right now, I understand Mr. Bedrosian is re-challenging that issue, the term willful. Just on a factual matter, a second. In 2008 or 2009, when he first steps forward, who does he tell that he may have a problem? His accountant. Okay. And the records, the testimony is a little bit unclear as to how that all came up. But the IRS had never approached him. Not at all? Not at all. And that, you know, that's one key fact. And I would submit here where there's no tax liability. I mean, for tax year 2007, his taxable income line 43 of the return was zero. For the following year, he did have some taxable income. I think he had $50,000 or $60,000. But, you know, I mean, he alerted his accountant that, you know, these accounts weren't reported. But these accounts didn't owe any, you know, didn't have a tax liability. Well, these accounts that were in various places outside the U.S., do not owe any tax. Since I don't have any foreign accounts, I don't have to worry about them. Do you not owe any income tax if you're a U.S. resident, if you have earnings on those accounts? That's the way you phrase that question is a little dicey. So U.S. persons, and Mr. Collins is a U.S. citizen, so he's a U.S. person, has taxable income on all of his passive income worldwide, subject to, although it does not apply here, a foreign tax credit. So if you lived in Canada and you pay taxes there, you wouldn't pay double tax. These accounts were mutual funds. And so the increase in these accounts were unrealized gains. So in that sense, he did not have income. However, and he had a huge or substantial capital loss in 2002, which carried forward through all these years. So he knew he was never going to have a capital gain, at least as it's defined, you know, in the conventional term. There was sort of this wrinkle, which neither he nor his accountant, nor Leach Tishman, his law firm at the time knew about, which is that if you own a foreign mutual fund, increases are reviewed annually. And if you look at page 618 of our appendix, you can see how this is computed, because it's very counterintuitive. But an increase in the account is reviewed annually. And when the position is liquidated, you pay a tax as if the increase each year is treated as a dividend, and it's taxed at the highest marginal rate for the year. How does your assertion that he owes no tax, that he owed no tax, how does that have any relevance at all to this provision? The Bank Secrecy Act provision? Yeah. I mean, the circuit has held that this Bank Secrecy Act is positioned to, you know, increase tax compliance. So, you know, when you fix the purpose of the act. I mean, that's the purpose of the act. But to Judge Rendell's point, the act requires that the FBAR be filed, correct? The act requires that the FBAR be filed, that's correct. I want to start with what we agree on, and then we can get to what we may or may not disagree on, okay? So what we agree on is the FBAR needs to be filed. Correct. This dual citizen had to file it. Correct. He failed to file it. Correct. And the only real question, or the first real key question is, was his failure to file willful? Correct. Or innocent? Or negligent? Or negligent, right. And the district court cited several factors in support of its conclusion that it was willful. For example, there was a finding of an actual intent to deceive. Do you disagree that Collins was a sophisticated taxpayer? I think that Mr. Collins was like any other taxpayer. He had limited experience in this area. And we agree on the definition of willful, which it's an objective standard, action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known. That's correct. And he answered on his tax returns, he consistently answered no to the question as to whether he had any foreign accounts, correct? That's correct. I mean, isn't it so obvious that it should have been known? Well, I wouldn't think that you would, that there would necessarily be a connection between non-income producing activity and the duty to report that on your tax return. No, but on the 1040, if he had read the 1040, he wouldn't have checked no, because that's false, right? There are two possibilities. Possibility number one, which I will suggest is the most common, is if he's got tax forms that are five inches thick, like some people, probably didn't read everything. In which case it was malpracticed by his accountant to lie on the form and say no. Or the other possibility is he's particularly detail-oriented and scrupulous and he went through everything and he himself lied when he said, no, I have no foreign accounts. Is there another possibility besides those two? I mean, yes, that there isn't a connection that would be made that for accounts that don't have taxable income, that the question on the Schedule B triggers a response yes. And I mean, I know that when you look at it, the answer is yes, but every other piece of information on the Schedule B relates to income. So within that context, and I'd note that when- What does it say? What does that question say? It does say, I mean, I acknowledge what it says and I tell people- So how does an accountant with this taxpayer, with bank accounts in three countries abroad, how does an accountant or tax lawyer answer that no? Well, Mr. Cower testified that if the accounts didn't have income, he didn't think you had a duty to report them to the Internal Revenue Service. But he was mistaken. Well, that's right. Because that's malpractice. That's right. And whatever liability this taxpayer has as a result of that malpractice is chargeable to the person that committed the malpractice. I think you're right. I mean, we filed a precipe of summons against him. And the case was settled? No, it's, you know, a precipe of summons told the statute of limitations. Yeah, so it's pending. It's pending. It's pending, okay. All right, well, let's get back to the record because there was a finding by the district court that the taxpayer intentionally managed the accounts to avoid disclosure. What's your rejoinder to why that's clearly erroneous? I don't think there's any support in that. There's a questionnaire, or sorry, a form that was executed in the year 2000 by Mr. Collins that's incomplete. And we, you know, we objected throughout the proceeding, both in front of the magistrate judge and a trial, to say it's not fair to present this questionnaire that says Mr. Collins intentionally didn't disclose his accounts to UBS and directed them to invest in foreign securities only when the other option wasn't presented. And I suspect the other option dealt with mandatory withholding at a 28%, right, you know, backup withholding. So it was like either don't invest in U.S. securities or we're going to withhold to 28%. Well, I mean, you know, that's a little bit different than I direct you to hide my assets from the United States. What about the district court's finding that he purposely avoided receiving mail from his Swiss bank in the United States? Mr. Collins testified that at a certain point the bank stopped mailing, told him they weren't mailing documents to his house, period. And they directed him they would mail documents to Europe and elsewhere, and that's where he got them. But I mean, he never- Why was it clearly erroneous for the district court to infer from that instruction that it was an intent to avoid having a paper trail in the United States? Because he testified that was the bank's policy, not his decision. It was the Swiss bank's decision. It was the Swiss bank's decision. And by the way- to other places outside the United States instead of to the United States? UBS, and we asked for discovery on this, but UBS as a policy matter in 2000, I don't know, three, four, stated that they were no longer going to correspond with U.S. taxpayers in the United States, or U.S. persons, account holders in the United States. So even if he wanted to receive the mail here, he couldn't because of their policy? Because of their policy. How about his statement that he relied on what the embassy had told him? About taxability. Doesn't that seem a little bit, it's either naive or at worst, maybe not credible. You know, that Mr. Collins feels very strongly that that's what he did, that he relied, you know, on the advice that he was given, and that this wasn't something he, you know, thought about. Again, these accounts didn't have income. So, I mean, you know, to sit here and think like, oh, it'd be one thing if there was substantial income being spilled out of these accounts. But, you know, to me, that really is the threshold issue. Really? I mean, the U.S. government wants to know about foreign country, you know, gifts from foreign people, you know, accounts in foreign countries. The government wants to know this, and it has no bearing whatsoever on taxability. It really is something that the government wants to know. And he has hundreds of thousands of dollars in these accounts. It did not occur to him, I think at one point, he wanted to transfer money in a, you know, in a discreet way. I mean, you know, there's a letter where he asked to send $9,500, and he uses the term discreet. I mean, you're right. There is a reporting requirement for foreign gifts. It's nowhere on the Schedule B, Your Honor. It's a separate form. It's a Form 3520. And most accountants don't know about it. To this day, most accountants don't know about the Form 3520. So, you know, and again, Isn't that the whole point of the form to flag for the Internal Revenue Service that there is an existence of offshore accounts? Because, I know this is not what Mr. Collins did, but let's take the worst case. Let's take someone who sets up a Swiss bank account and has millions of dollars of income that's taxable. You'd agree that's taxable in the United States for a U.S. citizen, right? Well, if the service doesn't know about the existence of the Swiss bank accounts, and a country like Switzerland is known for bank secrecy, it would be very easy to evade paying taxes, right? So the way the service can kind of make sure people are paying the taxes due on foreign accounts, the first step is to know the existence of the foreign accounts. Isn't that the very simple point of the FBAR? Well, I mean, look, it's a general proposition, yes, although there were a lot of things that you said in your question that were, I would think, factually inaccurate. For example, the FBAR doesn't go to the IRS. It goes to a completely different office within the Treasury Department. Now, yes, an auditor... But you're telling the U.S. government that you have these overseas accounts. Right, and the U.S. My premise is that, again, assume the worst. A U.S. citizen international tax cheat. The easiest way to be an international tax cheat is for the United States government to be entirely unaware of the existence of your foreign bank accounts, correct? That's correct. And the FBAR is intended to shine a light on the fact that the potential international tax cheat has foreign accounts. That's correct. So it's not just this sort of, why do we have this requirement? It's not this sort of silly requirement. It's sort of necessary if you're going to make sure that U.S. citizens who have international accounts actually are honest with their taxes. Would you agree? That is one effect of the FBAR form, yes. I would fully agree on that. But you can own assets outside of the United States, like real estate. There's no obligation to report it. And so, you know, I don't know... Our position is that given that there was no taxable income, given that these accounts were offset, the gains in these accounts were offset by substantial losses, the fact that it wasn't reported really, you know, was inadvertent. And, you know, there just isn't the same trigger. Like, yeah, if you're pulling millions of dollars out of your Swiss bank account and you know it's not hitting your return, I mean, there's a lot going on there that you know is wrong. I mean, this account, other than the fact that he had to check yes on the schedule on line 7B, there was no other activity on this account. I guess he could have reported his capital losses, which would have triggered a small additional refund. But there was no other activity on this account that had anything to do with April 15th. It all had to do with this reporting requirement that was separate on, and now it is April 15th, but June 30th, with a form that got sent to, you know, the service center in Detroit. Did the district court use the right standard of review? On the penalty? Yes. I mean, the district court used two standards of review. I mean, as we look back now, and we look- Which is the right one? There's a lot of confusion in the district courts about which one to use. I mean, my view is that the district court should set the penalty de novo. There were cases that we decided that the district court, like Talvey United States, that said the district court sets penalties de novo in this circumstance. Obviously, the case law has evolved since the hearing with the federal circuit setting, taking the lead, saying basically there's an abusive discretion standard. She did it under both. Well, she did do it under both, but when we argued it to her, we only argued it under the de novo standard, and then she came back and made an abusive discretion finding. But we didn't get the discovery, I mean, you've read our brief, that we think would have fleshed out why this wasn't abusive discretion. What's strange to me is abusive discretion seems to be better for you in a way. Here's why. The statute says $100,000 or 50% of the balance, correct? Correct. So that's just a mathematical calculation if there's a finding of willfulness. Obviously, not willful, 10,000 maximum. But if there's a finding of willfulness, then the agency just needs to do the math, right? Well, I mean... Or in the court, the court just needs to do the math. When the court is reviewing what the agency did, as long as the agency's penalty meets that statutory requirement of 100,000, the greater of 100,000 or 50% of the balance, why isn't that the end of the matter? Under de novo review, you either do the math correctly and get affirmed by the district court, or you do the math incorrectly and you get vacated or modified. That's de novo. If it's abusive discretion, then the district court can sort of apply a Goldilocks test to what the service did and said, you know, gee whiz, 308,000 sounds really, really high. So I'm gonna cut it in half. That would be typical exercise of discretion by a trial court, wouldn't it? Well, I would think if the trial... I mean, I see your point. I've always viewed this as sort of like a Fatico hearing in front of the district court. So if the district court had de novo review, it would be like a sentencing almost, you know, where they can come in and examine all the factors and set the penalty what they think is fair and just, because it's really the first time the taxpayers had an opportunity to appear in front of a neutral. How could half of the mitigated amount be an abusive discretion? Well, half of the mitigated amount. But it's half of the mitigated amount by year. So effectively, you know, when you get, if you get sentenced for filing three false returns, they don't take the tax loss by year, sentence you by year and then stack the sentences. You get one course of conduct with relevant conduct. That's the penalty supposed to be for every year. I mean, we're talking about the statutory provision. We're not talking about where she really has discretion to say, oh, we're just going to forget about that other year. Right. I see your point. But I mean, it's a harsh, but the crux of your argument is the punishment doesn't fit the quote crime. And this is not a crime. This is a civil penalty. It seems like reading your briefs, that seems what really comes through as wow. These numbers are eye popping considering the type of violation. That is one of our arguments. I mean, this is an incredibly unjust result. And the problem with that is Congress seems to have have allowed this kind of really harsh penalty in the case of a willful violation. Right. Although, you know, this gets back to and we didn't argue it in the briefs, but I mean, you know, Safeco, which really sets the standard that the Third Circuit adopts and other courts have adopted since, postdates the Bank Secrecy Act by 30 years. I mean, I don't know that Congress was really delineating the difference between willful and civil and criminal cases back in 1970 in the same way. It predates the conduct here. It was in 1994. Right. Conduct here, so I don't know. So, but that's, I mean, that's sort of our view. I mean, one area where the court should look closely is these FCCA penalties that the district court imposed. The Federal Claims Collection Act, it's also called the Post-Judgment Collection, the Debt Collection Improvement Act. You know, our position is that those don't apply and we lay out, I think, in pretty clear detail in our brief why. Statutory language, any amount owed to the government. How do you accept it out, this situation out of 3717? Well, first of all, if under Bedrosian, you know, you look beyond Title 26 to determine something's a tax and if someone has to full pay the amount because it's quote, unquote, a quote. It's under the Bank Secrecy Act. Well, but I mean, I agree, but the Third Circuit, this court said it's a tax. And then, you know, the other thing is if you read the Blanca case, which is cited by the government in their brief, it says basically that the FCCA doesn't apply to penalties and, you know, this is clearly a penalty case. How you read the holding in Blanca, the FCCA doesn't apply to penalties? The federal claim, well, they call it the Debt Collection Improvement Act, doesn't apply to cases where there's a statute of limitations such as penalty actions and they cite to 2472 or 2082. I can't remember the statute. I mean, the language of that tracks pretty closely to the Civil Bank Secrecy Act. I didn't see that raised in your brief. We raised it in our reply brief in response to the government citation to Blanca. All right, you've reserved six minutes. We'll see you on rebuttal. Thank you, Mr. Silversmith. Ms. Avetta. Thank you, Your Honors, and may it please the Court, Julia Avetta for the United States. Schedule B asks, at any time during a tax year, did you have an interest in, or a signature or other authority over a financial account in a foreign country? And year over year, Richard Collins said no, again and again. It's a pretty small section. It's a pretty small part of Section B, isn't it? It is all the way at the bottom of a page. That's correct. It is at the bottom of page two of Schedule B, which is not at the very beginning of your tax return, it's true. However, there was no clear error here in the district court's factual finding that Richard Collins willfully failed to report his foreign bank accounts to the United States government. He deliberately said no year over year while he had at least three bank accounts. Maybe, as Judge Hardiman said, didn't really look at those reports. And they had been prepared by the accountant. And, you know, he should have looked at them. He didn't look at Schedule B. He just signed and wrote his check, whatever he owed. Is that reckless? It is, by this court's own definition. Enough to be willful? Yes, under the standard of this court and under the standard described in Norman and Rum and Horowitz, as well as the Drozian. Is there an unjustifiably high risk that you either should know or should know? How obvious is it in a tax return that you are signing and filing? And the Federal Circuit in Kimball held that this box, without more, not even looking to the rest of his conduct yet, puts a taxpayer on notice that he has this obligation. And when you ignore that notice, that takes you into the world of recklessness. You clearly ought to have known that there was a grave risk, that there's a requirement here that you're not complying with, and you're in a position to find out easily. Open your tax return and read it before you sign it. And based on that alone, before you even look to the rest of the record, the decision of the district court was correct as a matter of fact. This court has also held, in conformance with Supreme Court authority, that when there is more than one reasonable reading of a record, there is no clear error in either reasonable reading. Now here, Judge Bassoon made exhaustive factual findings. She said Collins had foreign bank accounts for decades. The aggregate balances in these accounts were always over $10,000. For decades, he did not report these accounts to the government, even though the Swiss bank account in particular had hundreds of thousands of dollars in assets. And Mr. Collins actively directed the bank in the management of those assets. It was not so simple as signing a form once and saying, oh, I can't get mail in the United States anymore. By the way, no discovery was necessary on this point. The conduct and the practices of UBS Bank were a matter of public record pursuant to a deferred prosecution agreement entered into by the United States government. There was nothing to ask in discovery or at trial that could not have been discerned in the public record. What about their argument that UBS made the decision to stop sending these things stateside? Why would the district court charge him with some kind of evil intent if that wasn't within his power to make that decision? Even if it were not within his power to make that decision, the court did find that he went out of his way in other ways to conceal those assets from the United States. He transferred his funds to Spain. So you would agree then the district court erred with respect to that discrete fact finding, but your argument is there are other facts that show that this was willful. We do not agree with that point, Your Honor. Well, then what supports the correctness of that? He did sign an agreement. And if he had resisted that agreement, he was not obligated to sign it. What it said was, I don't want the U.S. government to be aware of my tax accounts. It was aware of my bank account with UBS. And it basically was saying to him, here's our brand new, very, very high secrecy policy. And he chose to comply. Take advantage of it. Yes, he got the benefit of that secrecy. And that should not be read as a passive or resistant, like he would have liked to disclose it, but the bank was preventing him from doing that. That was not what that form represented at all. Do you know, do we know, does the record show why he came forward and disclosed these accounts at all in 2010? They'd been going on for many years before. I think the record reflects that he read an article and saw that the government was ramping up its enforcement efforts to discover more of these secret accounts held overseas, which in fact is the case. And maybe he got nervous and went to his accountant. But we also note that Judge Bassoon did not credit, did not find credible his testimony that he immediately went to the accountant and told him as soon as he knew. And there's some ambiguity in the record about how much the accountant was aware of. But there's no clear error in the court's factual finding that he was not fulsome in his disclosures to the government. And he certainly did not promptly in 2010 come clean. Throughout his dealings with the IRS, his story for why it took him so long to disclose these accounts kept shifting. In 2010, he said he was told that if he had filed a W-9 with UBS, he was excused from all of his U.S. tax obligations. In 2013, he said, oh, I asked someone at the French, at the U.S. Embassy in Paris in 1972. And I relied on that official representation for the ensuing three decades. In 2014, he said, oh, my bank UBS told me that because I was withholding, because my tax obligations were being met, so were my disclosure obligations and I had no further responsibility there. He then also admitted to the IRS that there would have been a substantial cost to him of incorporating the data from his foreign accounts into his U.S. accounting books. And he was concerned about that expense. And in 2015, he actually argued to the IRS that Swiss law prohibited him from disclosing the existence of the account. This is not the behavior of someone who has been clean. In the government's view, it's quite a coincidence that every one of these justifications were down to his benefit in terms of not disclosing. The advice was never the other direction. Interestingly enough, it wasn't. Did the district court use the right standard of review? It did, Your Honor. The standard of review is bifurcated in a trial like this. The de novo review goes to the question of willfulness, which the court described as the validity of the penalty. And in the context of the validity of the penalty, the question is, did the defendant act willfully or non-willfully? And if he acted non-willfully, the willfulness penalty is not valid. Wait, that's de novo? The review of whether he acted willfully? No, I beg your pardon, I misspoke. That is a factual finding, as Your Honor observed, which is reviewable by this court for clear error. Because, I mean, well... It's de novo with respect to the findings of the IRS. It's a de novo proceeding in the district court where the trier of fact makes findings of fact that are then reviewable on a clear error standard here. Right. But when the district court's reviewing the agency, help me with the questions I was asking Mr. Silversmith. Is it just do the math? And if you do the math, it's done? If the service does the math right, 100,000 or 50%, then it's essentially unreviewable by a court. Or does a district judge have the ability to calibrate the extent of the penalty based upon what the district judge thinks in her discretion is, quote, fair or appropriate? I think the answer to Your Honor's question is somewhere in between, and it's closer to review of an administrative determination where you have an administrative record rule. And you're looking to see if in the determination of the penalty, once its validity has been determined, at the administrative level, did the IRS engage in reasoned decision-making? Did it comply with statute regulations, policy and procedures? Was everything done correctly at the administrative level? I guess that's very helpful. I guess my follow-up is, how can it not have engaged in reasoned decision-making if it scrupulously adheres to the statutory parameters Congress has set forth? I, in preparing for this, I looked for cases that would fall in that exact zone, and we've not encountered them. But in theory, there could be, well, there could be instances where the reasoned decision-making was improperly influenced. But we don't have any evidence of that on the record here. And we have not in these cases that have come up. And that goes to Judge Rendell's point before of, is it, you know, if you have evidence in the administrative record that statute, regulation, policy and procedure were followed and proper reasoned decision-making was engaged in, is that not it? Like, are you done? It seems to play in their hands on the discovery issue, though, because one of their arguments is there was a disagreement between the line agent and the supervisor about what the appropriate penalty was. And they'd like to know why that disagreement occurred, right? And we submit that that deliberative process is privileged regardless. I mean, because the outcome is what's being- And if it's privileged, how can the court review whether it's reasoned decision-making or the product of bias or animosity? Well, and that's the hard question. That's the margin case. How is it privileged? The deliberative process, back and forth between government officials, that's pre-decisional and has not yet reached the- You didn't assert that. You asserted it really wasn't relevant, correct? We asserted it wasn't relevant because at that point in the proceeding, the question was, is it relevant to the validity determination? No one was talking about the determination of the amount. And as we discussed, that's the universe where it is not relevant. Validity goes- The amount, they wanted it lower than what it ultimately was, correct? They did. And on this record, when you've got a penalty that is squarely within the statutory range and the administrative record raises no questions of improper decision-making, then there is no abuse of discretion and the district court- Are you familiar with any cases where there was evidence of improper reasoned decision-making? I am not, although the Rum case involved an argument where the interference of the revenue agent's supervisor arguably represented an abuse of discretion. Why? I think because the position that they took was not that anything improper had occurred, but that that interference deprived the revenue agent of the necessary discretion to compute the penalty. And the 11th Circuit in Rum held, no, that is not the case because they make that decision in concert. And I think that's true here as well. How does the court know that? How does the court know that based on this record? The administrative record here is fulsome. The revenue agent's work papers are in the record. And if the district court- It doesn't explain why they wouldn't further mitigate it. It does not explain why, and it didn't even raise the question to the district court whether the supervisor actually challenged those penalties or not. There was discussion between the two, between the revenue agent and her supervisor. But the record doesn't evidence disagreement. It doesn't evidence, obviously, we're getting into privileged information here. But the answer can't be that the government waives its privilege so that people can go on a fishing expedition in search of bias when you're reviewing an administrative record to determine whether there has been reasoned decision-making. Are there many of these cases filed against individual taxpayers? The civil penalties under the Bank Secrecy Act, there are a good number recently, yes. Good number what? In the past several years, there have been a fair number, yes. And there are more that settle that we don't see. Because we have increased enforcement of the Bank Secrecy Act, and that has been delegated to the IRS and then by consequence to the DOJ. The one thing that struck me here, and although the penalty for each year was actually only a quarter of the fund, it was still the same sum, virtually the same sum in the fund in consecutive years. Yes. Is there any inequity from that standpoint? Or is that inequity reflected in the reduction to a quarter? Where the penalty is willful, the statute imposes an enormous financial burden. Because Congress has placed that burden on the account holder to report and the penalty is stiff if you don't. And it's a stiff penalty here. And this account holder has received the benefit of mitigation and the benefit of a further reduction because he did eventually file. So yes, the penalty is large because Congress said this is a course of conduct that we want to penalize aggressively. And he has also received many reductions in the penalty because his conduct has earned that. But it is true that if for 10 years someone doesn't file and it's a dormant offshore bank account that has a million dollars, they're looking at $5 million, right? 50% a year for 10 years? The penalty can be cumulative over years, doing math on that. But has that ever really happened or as a practical matter, do these things always just get negotiated away? I mean, are there any reported cases? I guess Mr. Silversmith will tell me. I'm wondering if there are any reported cases where the FBAR penalty actually exceeded the corpus of the amount of money that was not disclosed. The statute certainly allows for that outcome. I am not aware of cases, certainly at the circuit level. All right, what about the amnesty? I'm fascinated and confused, quite honestly, about the fact that he's in the amnesty program and he's out of the amnesty program. And then it seemed that upon his exit of the amnesty program, it triggered an audit, which I think is automatic. But can you tell us a little what the government's view is about the whole in the amnesty and out of the amnesty program and what it meant for this case? It does not affect the computation. Because that's the... I know it doesn't affect the dollar amount, but does it have anything to do with the case? Is it a total sideshow or... Yes, it is. And that's why the record on that is not developed, because it's not relevant to his willfulness, which happened... And the fact that you're talking about 07 and 08 seems a little curious to me because his failure to report was many other years too, right? Those earlier years are time barred. They are, okay. And subsequent to that, he filed amended returns. Although we maintain that his tax liability, as Judge Rondell noted, is a completely separate issue from whether or not he disclosed his foreign assets. But his compliance and his willingness to work with the IRS are mitigating factors that the revenue agent did consider in lowering his penalty. So even if he stayed in the voluntary disclosure program, he still would have had to suffer these FBAR penalties? I believe that there are alternate ways to work that out if you're in the program. I don't think that it's a foregone conclusion that he would have come away with this liability had he stayed in the program. If the court has no further questions, we will rest on our brief and ask for affirmance. All right, thank you very much, Ms. Aveda. Let's hear the rebuttal of Mr. Silversmith. Thank you, Your Honor. A couple of things. First, as to Judge Fischer's question at the beginning, where you asked about the question on Schedule B, line seven, question on Schedule B, line 7B, that form, the Schedule B, I mean, it's only required to be filed if you have income, you know, dividend income or interest income. Now, it turns out, and Mr. Cowher was wrong about this, if you have a foreign account, you're required to file Schedule B and check yes, even if you don't have any interest income. But Mr. Cowher didn't know that. And, you know, I do think it's somewhat, that's why I think this is somewhat counterintuitive. It's on a form that these accounts didn't trigger the duty to file that form. And that, to me, is the disconnect on the willfulness. We've argued, I've argued this earlier. But wait, the form was filed, though. Well, it was because he had domestic accounts that had capital gains. So I get that. And if, would you agree that if it was Mr. Cowher's fault, I don't know that it was, but if it were his fault, that's chargeable to your client under the rules of the game. And then your client has a cause over against Mr. Cowher. That's why you filed the press before the summons. I mean, what's a reasonable cause is normally your defense when you're in an audit situation and you have a mistake by the accountant. But, you know, I would say that makes it non-willful. I mean, so if my accountant makes a mathematical mistake on my return and I don't catch it, the defense in Title 26 penalties is reasonable cause. And then the government says, you know, this was a pretty clear arithmetic error. You should have caught it. And then you go litigate that issue in tax court. Reasonable cause isn't a defense for an FBAR penalty. So, you know, therein lies the rob. But to me, you know, and I get that there was certainly uncertainty in the record as to what happened. Mr. Cowher doesn't remember his schedule or his organizer's blank. Mr. Collins testifies that, you know, they did discuss this at some level. But, you know, reasonable cause isn't a defense. And I would certainly not encourage this court to just shovel it off to an accountant malpractice lawsuit. Getting though back. And you're quite right. Regardless of whether he has a claim over, that doesn't help us answer the question of whether this record supports a finding of willfulness. And I do want to answer. I have a couple of things I want to go over, but I do want to answer your question about the voluntary disclosure program. So in 2009 or 2010, the IRS announced an offshore voluntary disclosure program. It was the first of its kind. There has historically been a voluntary disclosure program for domestic disclosures. In this offshore program, there was a stipulated penalty, and the numbers have changed, so I may be a little off, initially of 20% of the balance of the account. So Mr. Collins applied after that program closed, and he got into what was called like the second offshore voluntary disclosure program, where the IRS bumped that penalty up to like 25 or 27 and a half percent. What happened, and I mean, this is not contained in the record, but I'll just tell you, Mr. Cower prepared amended returns, which Leitch Tishman reviewed. They told Mr. Collins, like, you don't owe tax, because based on Mr. Cower's analysis, you're entitled to a refund. Is that because of the lost carry-forwards? Well, the lost carry-forwards in these accounts generated small additional refunds. The caveat, which Mr. Cower and Leitch Tishman didn't recognize, is that there was an additional tax on owners of foreign mutual accounts. PFICs. PFICs, right. He opted out of voluntary disclosure and then was selected for audit, which happens to everyone who opts out. And at that time, the IRS said, oh, you, Mr. Cower, you missed these PFIC taxes. The penalty, and again, it was roughly $200,000 in voluntary disclosure. But once he opted out, it opened Pandora's box and the IRS said no. I would suspect that the revenue agent, when she was speaking with her supervisor, said, like, this is a pretty absurd result. This guy tried to come in, his accountant prepared inaccurate returns, and now he's getting hit with a penalty. Why would he leave the program? Because the program's only designed for people who are, the term they use is non-compliant. Meaning, if you owe taxes, you do the program. If you don't owe taxes- The program's not for people, doesn't include people who fail to file the FBAR? No, it's a tax program. It's not an FBAR program. Now, interestingly, fast forward six years, the IRS has a new program called Streamlined Voluntary Disclosure. Individuals who have foreign accounts that don't have income, taxes, are permitted to enter a streamlined program. They certify that their conduct was non-willful and they pay a 5% penalty. In this day and age, I mean, look, what the findings are of the district court, but these facts where you have a foreign citizen who set up the account, living outside of the United States, used the account for many years, and had a justifiable basis for the account, it wasn't like a pizza shop owner who was funneling his income to Geneva. During this period of time, the relevant period, 2007, 2008, a couple years thereafter, was he living outside the United States or was he living in Cranberry? From 90, well, from 2002 to the present, he's lived in Cranberry. From 94 on- He was in Cranberry. He was- Cranberry from 2002 on. Yes, I mean, he was substantially present, so that would have triggered a, well, he was a U.S. citizen, so wherever he lived, he had a- I understand that. But he was present, yes. Just a few other points. You, Judge Hardiman, asked what benefit did Mr. Collins receive by not filing? I mean, he didn't- I don't know that there's any evidence that he had capital gains in these accounts year after year or any year, so I don't know that he ever received a benefit. He got no benefit because he didn't have tax gains. I can't say to you that in 1995, he didn't have a capital gain, but there was certainly no evidence, and his testimony was, I never took money out of these accounts. So, and the government does, other than this one $10,000 transaction, they don't dispute that. Second, the government referred to page 287 of our appendix, which is, I don't remember the exhibit number, but it's this form that UBS required all of its account holders to sign in 2000. We asked the government to give us a complete copy of the form. We didn't get it in discovery from Magistrate Judge Dodge. We objected to the admission of the document at trial. The document says, in really self-serving terms for the bank, don't invest in U.S. securities because I don't want my name disclosed to the IRS. And then there's a big thing, word at the bottom, or, you don't see what the or is. I mean, we didn't get a copy of page two. The regulations, though, that the government, or that UBS is talking about, are the qualified intermediary regulations, which required at that time that certain accounts be subject to mandatory 28% withholdings. So, I'm not sure. I mean, I think I know, because I worked at the Justice Department at the time, that that form was basically saying, don't, we're not going to let you invest in U.S. securities, or we're going to subject you to 28% withholdings on all transactions. I can't tell you that's what's in there, because it's not in the record. But I don't think it's fair to look at that form and say, oh, well, this is the proof that he was trying to hide from the IRS, because we don't see what the other option was. I mean, the reality is, the bank wasn't making it easy for people to withhold and pay taxes to the IRS. That is the reality. Should he have closed the account and gone somewhere else? I mean, yeah, in retrospect, who knew UBS was going to plead guilty, or sorry, enter a deferred prosecution agreement to hiding thousands of accounts. But, you know, you come to a bank, they give you a pre-printed form and you sign it, or they give you a variety of options. You know, and when I take money out of my Vanguard account, I choose the option with the least amount of withholding. I suspect that's probably what's going on here. I don't know that it was fair to impute sort of invidious or a fraudulent purpose to signing that form, as the government would have you think. You know, is that the question, though? Is it fair or is the question is is the question whether it was clearly erroneous? I don't think I think it's clearly erroneous to find that that form had any probative value without seeing the or. And that objection, you know, we lodged in discovery, we asked for a copy of the complete form from the government, which had entered into a deferred prosecution agreement with UBS. The revenue agent was familiar with the form during her deposition because she had audited hundreds of you. What's your best evidence for this not being willful? I mean, to me, the best evidence is that there were no capital gains in the account and no income in the account. And this would be completely different story if he was pulling money out of the account or there was income in the account. And I think in light of Bedrosian, which I realize it sort of dict musings of the panel, that this is really a tax statute. You know, this statute was enacted in 1970 to go after criminals. And I think of people like Clifford Irving, you know, the Richard, you know, the movie where the guy forged Howard Hughes's book and hid all his money in Switzerland. I mean, that's who these statutes were designed to go after. And now, 40 years later, they're being used extensively by the government. You know, the amnesty programs are draconian. The 20 percent program you asked me about before, it's gone. It's now a much higher penalty. It's a mandatory 50 percent penalty if you enter voluntary disclosure. Six years of amended returns, one year of a stipulated fraud penalty, a 75 percent penalty. I mean, they're just those seem like policy arguments. Those seem like those seems like those seem like policy arguments to the effect that. That the government 50 years ago did have a problem with people sheltering income overseas and the congressional response to mitigate that real problem has been draconian and completely out of whack with what makes sense. That could be a really persuasive policy argument, but I don't know how even granting you that, I don't know how that helps you in this case. Well, you know, the last piece of this is the revenue agent who audited Mr. Collins thought that the penalty was too high and the IRM gives her discretion subject to supervisory approval to recommend a lower penalty. There was no written back and forth as the IRM requires. What did she recommend? Is that Agent Zhang? Yeah, Agent Zhang. What does Agent Zhang recommend again? I forget. Well, we just see her notes, which we obtained not through discovery, but through FOIA. And in the notes, she says, you know, I talked to my supervisor and he said raise the penalty. And I have a cite in the brief to the four dates. Unless you allege an improper purpose, such that, you know, he was Jewish or anti-religious, anti-racial bias or something, unless you do that, where does it get you? The deliberative process, you know, I don't know. To whom do we defer? Agent Zhang or the agency? Yeah, and as long as this is within, you know, you've got to understand, and you do, that the mitigated amount was one thing. They already mitigated it and then imposed half. So unless you can find some irrational, arbitrary, capricious, for an improper reason, where does it get you if there was a disagreement? Well, the IRM has a two-step mechanism. Step one is you do the computations on the worksheet that get to the mitigated amount of $308,000. And it's mitigated because they've looked at these things and they've already said he's not a habitual, he's not this, he's not this. And you get the mitigated amount and then it's half of it. Well, half and then doubled because they didn't post it for two years. But that's a requirement each year. So I just don't know how we say, aha, there was some evil lurking here. And a lot of it's jacked up because of interest over time. I mean, the time value of money here is a big aspect of this large number, right? No, I mean, the penalty was based on the value of the account in 07 and 08. No, that's the FCCA penalty between 2016 to the date that Judge Bassoon entered final judgment. So there's no interest on this? There's no interest. Well, the IRS didn't assess the penalty until 2016. We, Mr. Collins, signed extensions of the statute of limitations. There was no penalty. There was no interest on the penalty as assessed in 2016.  This gets to that last argument in our brief from January, whatever, August 6, 2016 to the date of judgment. There, you have about $100,000 of additional failure to pay penalties. Yeah, and as I argue in my brief, it wasn't clear. It certainly wasn't clear to me. It certainly wasn't clear to members of the tax bar where you go to challenge these cases. And we had to wait. And yet we got hit with $100,000 of additional penalties. I mean, if we had filed, I mean, this court said, Mr. Bedrosian did it wrong. So it wasn't clear how to do it. And, you know, to me, the FCCA, I don't think it's a closed call, but even if it's a closed call, the run should go, the tie should go to Mr. Collins, not the government. It just, it sure seems like somehow I got admitted to the tax bar. I don't remember why. I think I had two cases in the tax court, but so I'm not speaking from any sort of wealth of experience, but it sure seems like the type of case that should have been negotiated out. And, but one, we certainly understand your argument, Mr. Silversmith. We understand the government's argument. We appreciate you. Can I just add one last point? You had asked about, did the agency follow its process? I mean, the process requires a second step, which is, you know, revenue agent, line revenue agent discretion. And here you have evidence that we've got through FOIA that the revenue agent thought the numbers should be lower. So we would have expected to see some additional back and forth. Now, nothing was produced that was written. And I realized the government saying deliberative process, but let's be clear. Deliberative process isn't asserted by the line attorney at the justice department. It's asserted by, I think, according to the IRM, the deputy general counsel or deputy chief counsel of the IRS. So what's frustrating there is there's case law that says that the IRM isn't law and they're not required to follow. No, but there is a lot of case law, including case law in the circuit that executive privilege is asserted by a high ranking government official. And so maybe you don't have to follow the IRM as to who asserts the privilege, but certainly the government lawyers who are coming into this courthouse don't have authority to assert that privilege. You may say the revenue agent has discretion, but the final determination is up to the supervisor, is it not? It is, but what I would say is if we had the revenue agent's discretion and if this court conducted an abusive discretion analysis, we could have said, this is why the IRS's decision was wrong. We didn't have a complete record, right? We don't have her back and forth revenue agent recommendation, supervisory rejection, which is what I would have expected to see under the circumstance. And that's our position. If this is going to be an abusive discretion, we ask for that information either in discovery through deposition, there was a protective order, it should have been produced even if fully redacted and then we could have moved to compel and they could have asserted executive privilege. We got none of it. We only got a little bit that we got through FOIA. All right. Thank you very much. Excellent briefing and argument. We understand your positions. Let's just have counsel, we'll end the recording. Ms. Ayala, we'll just have counsel come to sidebar just briefly.